712 So.2d 273 (1998)
STATE of Louisiana
v.
Leroy Timothy YOUNG.
No. 96 KW 2079.
Court of Appeal of Louisiana, First Circuit.
May 15, 1998.
*274 Walter P. Reed, District Attorney, Covington, and Dorothy A. Pendergrast, Metairie, for State of Louisiana.
James E. Boren and J. Rodney Baum, Baton Rouge, for Defendant-Appellee Leroy Timothy Young.
Before LOTTINGER, C.J., and SHORTESS and FOGG, JJ.
LOTTINGER, Chief Judge.
Relator, Leroy Timothy Young, was charged in a two-count bill of information with stalking (count 1), and simple assault (count 2), of Twenty-Second Judicial District Court Judge Larry J. Green (hereinafter sometimes referred to as "the Judge"), violations of La. R.S. 14:40.2 and 14:38, respectively. Relator pleaded not guilty; and, following a bench trial, the trial court found relator guilty as charged on count 1 and acquitted relator on the count 2 charge. The trial court sentenced relator to serve two months in the parish jail, suspended the sentence, and placed relator on supervised probation for a period of sixty days subject to various conditions, which included the issuance of a permanent injunction prohibiting relator from going within two hundred fifty feet of or making any contact with Judge Green, and the Judge's family and staff, except insofar as relator being permitted to be around the courthouse during his self-representation in his ongoing domestic case. Relator filed this application for a writ of review. On December 13, 1996, we denied the application. Thereafter, the Louisiana Supreme Court granted relator's writ application and in an amended order remanded the case to us for briefing, argument, and an opinion. See State v. Young, 97-0809 (La.11/21/97) (on rehearing), 703 So.2d 1253; State v. Young, 97-0809 (La.9/26/97), 703 So.2d 1253. In his application, relator urges two assignments of error. For reasons more fully stated hereinafter, we find merit to relator's assignment of error number two arguing that there was insufficient evidence to support his conviction; hence, we recall *275 the previous denial of relator's application, grant the application, reverse relator's conviction, vacate his sentence, and enter an order of acquittal on the charge of stalking.[1]
Relator and his ex-wife, Linda Warden, were litigants in two civil suits in Judge Green's court. One was filed by relator seeking a divorce and custody of their minor child, Brandi Young, and the other was initiated by Warden seeking a divorce. Warden was awarded provisional custody of the child and later permanent custody. Relator was represented in the civil matter until April 1994, when his attorney, Mary Grace Knapp, withdrew as counsel; and, from that point, relator proceeded pro se in the civil cases.[2] A warrant for relator's arrest was obtained after a series of incidents (some while relator was represented by counsel and some while he represented himself), including telephone calls by relator to members of the Judge's staff (some of which were directed at speaking to the Judge or obtaining a status conference); relator's presence at the courthouse and in the Judge's courtroom on a number of occasions; a telephone call by relator to Sue Langhoff, a former secretary of the Judge; the Judge's observation of a parked car (occupied by an unidentified white male) near the Judge's home on February 23, 1995, during lunchtime; and relator's walking from an alley and staring at the Judge outside the courthouse, when the Judge returned to the courthouse shortly after observing the parked car. Judge Green met with Sgt. Wayne Mayberry of the Covington City Police Department on February 23, 1995. After relator was arrested on the following day by local police in the city of his residence, Mandeville, Louisiana, pursuant to an arrest warrant obtained by Mayberry, Lt. Jack West and Mayberry went to Mandeville, assumed custody of relator, and transported him to Covington. En route to Covington after having been advised of his Miranda rights, relator spoke to the officers concerning his arrest.

ASSIGNMENT OF ERROR NO. 2
In this assignment, relator contends that the evidence was insufficient to support his conviction of stalking. Relator argues that the only contact he had with Judge Green or the Judge's staff was in the context of his custody case, only at the courthouse, which was constitutionally protected activity not included within the definition of "pattern of conduct" in La. R.S. 14:40.2(C)(2). Relator asserts there was no evidence of any encounter between himself and the Judge other than at the courthouse and no evidence that he ever went to the Judge's home or followed the Judge anywhere. Relator further asserts that there was no evidence that he acted willfully or maliciously against Judge Green and no evidence that he threatened to batter the Judge or that he did anything intentionally to place the Judge in fear of death or bodily injury. Relator submits that the case against him arose for one of two reasons. Either the Judge was mad at him for filing a complaint against the Judge with the Judiciary Commission, or the Judge was paranoid due to prior criminal conduct of third persons, i.e., a murder/suicide in the Judge's courtroom, a threat on the Judge's life by a woman, and a robbery in the neighborhood where the Judge resided. Relator *276 concludes that the state did not prove a single element of the crime of stalking.
In reviewing claims challenging the sufficiency of the evidence, this Court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). See also La.Code Crim.P. art. 821(B); State v. Mussall, 523 So.2d 1305, 1308-09 (La.1988).
The crime of stalking as defined in La.R.S. 14:40.2(A) as amended by 1993 La. Acts, No. 125, § 1, the applicable law herein, is the willful, malicious, and repeated following or harassing of another person with the (specific) intent to place that person in fear of death or bodily injury.
La.R.S. 14:40.2(C)(1) & (2) define the term "harassing" and the phrase "pattern of conduct" (which is used in the definition of "harassing"), as follows:
(1) "Harassing" means engaging in a knowing and willful pattern of conduct directed at a specific person which seriously alarms, annoys, or distresses the person, and which serves no legitimate purpose. The conduct must be such as would cause a reasonable person to suffer substantial emotional distress and must actually cause substantial emotional distress to the person.
(2) "Pattern of conduct" means a series of acts over a period of time, however short, evidencing an intent to inflict a continuity of emotional distress upon the person. Constitutionally protected activity is not included within the meaning of pattern of conduct.
Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La.R.S. 14:10(1). Intent, absent an admission of such by a defendant, must necessarily be proven by inferences from surrounding facts and circumstances. State v. Hicks, 554 So.2d 1298, 1302 (La.App. 1st Cir.1989), writs denied, 559 So.2d 1374 (La.1990), 604 So.2d 1297 (La.1992). In the instant case, defendant made no such admission. Thus, it was necessary that the state prove this essential element of the crime by circumstantial evidence. The rule regarding the use of circumstantial evidence is contained in La. R.S. 15:438. This rule restrains the fact finder, as well as the reviewer on appeal, to accept as proven all that the evidence tends to prove, and then to convict only if every reasonable hypothesis of innocence is excluded. State v. Lilly, 468 So.2d 1154, 1158 (La. 1985); State v. Hicks, 554 So.2d at 1302.
Judge Green testified that relator was a litigant in the Judge's courtroom beginning in early 1993. The Judge's staff received and screened all in-coming phone calls at his office. The Judge started receiving phone call message slips of calls from relator after the Judge's custody ruling while relator was represented by Mary Grace Knapp. Until the ruling, there had been little or no contact by relator with the Judge's office. Once the ruling was made, attempted contact with the Judge increased. There was a slackening while the ruling was being appealed to this Court. After the ruling was affirmed on appeal, phone calls and letters commenced again.
Judge Green testified he would not honor relator's telephone requests for status conferences and relator was informed of that fact by the Judge's staff. Judge Green further testified that relator never spoke to him except in the courtroom, and that he told his staff not to respond to relator's calls or letters.
The Judge testified that he could not recall if it was before or after the affirmance of the domestic cases on appeal that relator was seen in his courtroom staring at him. Regarding the staring, the Judge described it as a stare of disdain, "just kind of a sick stare." These two or three occurrences, occurring over a period of three to six weeks, were on days when relator's case was not on the docket. Relator never gave the Judge a purpose or reason for being in the courtroom on those days.
*277 Judge Green testified that he notified other judges of relator's repeated presence in the courtroom, because a litigant had killed himself and the litigant's wife in the Judge's courtroom in Washington Parish in early 1993 just after the Judge had left the courtroom.[3] The Judge assigned a second bailiff to sit with relator. Judge Green did not think that relator came back to the courtroom, after the second bailiff was assigned, except when relator's case was on the docket. However, the Judge did continue receiving telephone calls and letters from relator requesting status conferences and posing questions about relator's custodial rights.
Judge Green acknowledged that his courtroom is open to the public but stated that it is rare for someone who may have been a litigant in his courtroom to "ever just to come sit in my court." The Judge estimated that, each day, one or two litigants represent themselves in his courtroom.
Regarding relator's appearances in the courtroom on days his case was not on the docket, Judge Green testified that relator was there for probably thirty minutes to an hour on the first occurrence. He did not know how long relator remained in the courtroom on the second occurrence, when the bailiff was with relator. The Judge further stated that he did not think relator came back after the bailiff sat with relator a couple of times.
Judge Green testified he did not speak to Sue Langhoff but received notice of relator having made a phone call to her (on February 1, 1994) and later learned of the tenor of the call from Langhoff's point of view. The Judge thought the call was strange and felt it could have been threatening. The Judge testified that the call "was the beginning of a chain of events that accumulated in February of '95 that were very strange." The call did factor into the Judge's feeling of his personal safety being threatened.
It was in February 1994 that Judge Green learned that relator had made a complaint against him with the Judiciary Commission. Relator introduced Defense Exhibit D-1 into evidence, a letter dated August 15, 1994, from Judge Green to the Judiciary Commission responding to the complaint.
Judge Green indicated that he began to be apprehensive of physical injury from relator based on a conversation he had with Mary Grace Knapp, but his apprehension had actually begun earlier during the domestic trial when one of the experts in the divorce suit testified that relator was "out to beat the system," which the Judge had "in the back of [his] mind."
Although Peter Clark had recommended in the domestic matter that relator be awarded custody of relator's minor child, the psychiatric report of Clark indicated relator did not "follow the rules." Additionally, one of the reasons relator frightened the Judge throughout the course of relator's conduct was that the Judge was aware of allegations of acts of domestic violence by relator brought out during the domestic trial, i.e., allegations of relator being drunk and hitting his wife and throwing a telephone through the window of the family home.
However, during the Judge's cross-examination, he gave the following testimony:
EXAMINATION BY MR. BOREN:
Q. February 1st, 1994, is the date you became concerned about your safety with Mr. Young?
A. Yes.
Q. And thereafter, Mr. Young filed a complaint against you with the judiciary, 10 days later, you received it on the 18th, right?
A. If that's when that letter was. You showed me, you showed me several letters. If that's what the letter said, I think it was.
Q. Yes, sir. And thereafter, you continued to make rulings adverse to Tim Young on his case, didn't you?
A. What were my rulings adverse?
Q. April the 17th of 1994, you denied his motion for a new trial?
A. I think that was pending at the time.
Q. Right.

*278 A. Right.
Q. Now, you feel that you could have made a ruling against a litigant that you felt was a personal danger to you? Would that be fair?
By MS. HERSHEY:
What is the question?
EXAMINATION BY MR. BOREN:
Q. Did you think, in April of 1994, while you were still hearing testimony and making rulings on Tim Young's case, did you feel at that time that you were in danger or threatened by Tim Young?
A. I think that I felt I was, at that time, maybe threatened. I don't know, I don't know what kind of danger I would have felt at that time. I guess in any job you feel some sort of danger at times. But I can't really, I can't take my, reconstruct my mind back. There's been so many dates and so many things. I cannot exactly tell you what was in mind at that date or that moment.
Q. Well, let me put it to you this way. You would not, as a judge, continue to sit as a judge on a case against a person, involving a person from whom you felt physically threatened or endangered, would you?
A. I don't think I really felt physically threatened at that time. And I don't think, I think the only thing that was before me was, I don't know truthfully the sequence of events out of the file. I guess there was a motion for new trial. All I had to hear was arguments.
Q. And rule on it.
A. And rule on it. And I guess that was before the appeal. I presume that was probably before the appeal. I'm sure it was. You know, I felt like I could go ahead and do what I think, hear that matter.
Q. You didn't feel so significantly such significant concern about Mr. Young that it wouldn't be fair for you, I mean, you agree, don't you, that it's not fair for a judge to hear a custody case about a person who he believes is stalking him, or threatening him, or in any way harassing him?
A. Well, it's according to where you are in the custody case. I mean, you are past the hearing now.
Q. So, you think it would be appropriate for you to make rulings on a litigant you felt wasI mean, you recused yourself now, right? And you recused yourself in October of 1995 because you were the complaining witness in a stalking case against Mr. Young?
A. There was nothing pending from February, I think, of '95 up until that time. And
Q. Well, now, if I tell you that the record disagrees with you on that
A. Well, I don't
Q. that there were pending motions filed by Mr. Young for contempt and visitation modifications and all sorts of stuff like that, would you like to look at the record? I mean, I'm just telling you that the record is replete with pleadings, and there were pending things prior to October of 1995.
A. Well, I don't recall. But I, asI thought I had my clerk check. And at the time, there was nothing pending until such time that I think I gave the reason why I signed the motion to recuse myself.
Q. But my question is, you know, Judge, in order to either avoid the appearance of impropriety or to avoid being a person who was biased against a litigant, you know that a judge simply can't sit in judgment of a person who he is (sic) accused of stalking, right?
BY MS. HERSHEY:
Objection. This has asked (sic) and answered.
BY MR. BOREN:
I don't think it has been answered, Judge.
BY THE COURT:
Not specifically as put. Go ahead.
BY THE WITNESS:
Excuse me. Repeat your question.
EXAMINATION BY MR. BOREN:
Q. You don't think it is appropriate for a judge to be a judge in a case in which the judge is a victim, or an alleged victim, of *279 one of the litigants stalking and assault, do you?
A. No. I don't think so. It, of course is, you have to take the whole thing. And as I said, I have to back (sic) and look at the filings, what was happening at that time, and where we were.
Q. The arrest was made in February of '95?
A. Correct.
Q. The meeting with Mayberry was in February of '95?
A. Correct.
Q. And you knew that Mr. Young was to be arrested or was arrested in February of 1995?
A. I did not know that.
In further testimony, Judge Green stated that on President's Day, February 20, 1995, a court holiday, the phone rang in his office. Robert Tyler, Court Administrator for the Twenty-Second Judicial District, was in the office with the Judge. Tyler answered the call. The caller identified himself as relator. The Judge overheard the caller, who was excited, sounded upset, angry, and frustrated, and who wanted to do something about his daughter, who had been returned to the ex-wife early on a visit and was not in school that day. The Judge did not speak with the caller. Tyler informed the caller that court was closed and the caller would have to call back the next morning.
Judge Green testified that on February 21, 1995, his secretary, Kathleen Zelden, gave him a phone call message slip that relator had called and wanted a status conference or wanted to talk to the Judge about the child not being in school. The Judge did not return the call.
On February 22, 1995, Kyron Sharp, one of the Judge's minute clerks, addressed the Judge about relator's request for the court calendar. The Judge indicated the calendar is a schedule for not only him but also has information of the schedule of all the other judges of the Twenty-Second Judicial District and that it is not given out to the public. Its use is strictly by staff, as opposed to the courtroom schedule, which is displayed on a bulletin board at the clerk of court's office.
On February 23, 1995, the Judge left the courthouse between noon and 1:00 p.m. and went to his home in Covington. When he arrived home, he observed an old faded blue gray car parked on the street across from his residence. The Judge "kind of thought it looked like a Toyota." The car had one occupant, a white male, who was slouched over in the front seat behind the steering wheel. His attention was drawn to the car, because he had lived there for twenty-five years and no one ever parked on the street. The Judge did not get close enough to the car to identify its occupant. There had been a robbery in the neighborhood by someone parked in front of a neighbor's house. The Judge went into his yard. The car left. The Judge then went inside his house to check on his wife, who had also seen the car. The incident caused the Judge "great concern," because of the robbery. He also indicated the murder/suicide incident had frightened him. The Judge stayed home for about twenty to thirty minutes before returning to the courthouse.
Upon the Judge's return to the courthouse, Judge Green began talking to Judge Martin E. Coady outside the courthouse, relating to him the incident of the parked car. Judge Green testified that he thought he told Judge Coady that he thought it was relator who was in the parked car. The Judge indicated he based his suspicion on "just the general appearance of the person in the car." According to Judge Green, while he and Judge Coady were having the conversation, relator walked by them from the alley and stared at Judge Green. The look, a "look of disdain," a "real dirty look," lasted five to ten seconds, was scary and made Judge Green scared. According to the Judge, the look was disturbing to him, and he feared bodily injury. Specifically, regarding the incident, the Judge stated on direct examination:
I don't think Mr. Young would necessarily maybe walk over and hit me, or maybe physically. But he, I would not put it past him to do something to me and a vehicle, or to try to harm me in some way.
On cross-examination, the Judge testified that during the incident, relator did not make *280 any advance or movement toward him and that relator left without saying anything to him. Also on cross-examination, Judge Green acknowledged that the look might have been understandable as one from a litigant who had received an adverse ruling in a custody case.
When relator left, Judge Green asked Judge Coady, who was in his car about to leave the courthouse, to follow relator and see what kind of car relator was driving. Judge Coady followed relator but lost him in the parking lot. Judge Green further testified that he had no idea what kind of car relator was driving.
Judge Green indicated he would not have felt threatened if he had received only one phone call message slip recording a call from relator or one letter, or if there had been only one instance of relator appearing in the courtroom when relator's case was not on the docket. However, he indicated it was the cumulative effect of all the circumstances that made him feel threatened.
Mary Grace Knapp testified that the vast majority of her practice is in domestic law in St. Tammany Parish. She often practices before Judge Green, the sole judge presiding over domestic matters in St. Tammany Parish. She began representing relator in his custody and divorce proceedings in early 1993 and withdrew in April 1994, after relator's motion for new trial in the custody matter was denied by Judge Green. She testified that, at the hearing on the motion, relator addressed Judge Green. In doing so, relator stated that he had been informed that the Judge considered him a "security risk," because of his continued interest in his minor daughter but that he posed no risk to the Judge or anyone else. Knapp stated she was aware relator proceeded pro se after she withdrew as counsel and that he filed pro se pleadings, writ applications, and appeals.
Knapp had a conversation with Rebecca Kennedy, Judge Green's law clerk and hearing officer, in regard to relator, when Knapp became concerned there was "a possibility for some level of physical harm to occur" to the Judge from relator. Knapp indicated the conversation was in response to relator "being in the courthouse, being around, his demeanor, [and] his attitude." She was concerned that "perhaps he [relator] would cross the line." When asked during the prosecutor's direct examination if she felt her concerns were reasonable, Knapp replied: "Yeah. I felt my concerns were reasonable. I don't think my concerns were grave. But I think my concerns were distinct enough to have that discussion."
Knapp testified the last time she saw relator before speaking to Kennedy, relator's demeanor bothered her. Knapp saw relator in the lobby at the courthouse, and she saw him in the Judge's courtroom at a time shortly before his arrest. After she withdrew as counsel for relator, she thought he was becoming somewhat obsessed and was at the courthouse "a lot;" and he "sort of stopped acknowledging" her. It concerned her when relator would give her "strange looks" or "just be sort of out of place." Knapp indicated relator was acting differently than normal or than how she had known him to act.
Knapp recalled an encounter when relator said something sarcastic to her, which she felt was an "inappropriate comment." She did not recall what he said but testified that from that point she felt uncomfortable with relator. In describing the effect the encounter had on her, she stated that if relator would have been across the street from her, she would have walked a block to avoid him. Knapp wavered in her testimony on whether or not she felt threatened by the encounter, but finally indicated she did feel threatened. However, she did not feel sufficiently threatened to report the encounter to the police. Nor did she report it to Judge Green. In further testimony, Knapp stated that relator owed her several thousand dollars for her representation of him in the domestic matters. However, she did not pursue collection of the delinquent fees, because it would have been more trouble than it was worth to do so, citing her concerns for her safety.
During her cross-examination, Knapp testified that it is difficult to get a status conference. She explained that the docket is full and one must sometimes make repeated telephone calls, contacting the Judge's secretary *281 or one of his minute clerks to obtain a status conference. She acknowledged that relator frequently came to her law office and would have known such repeated calls would be necessary to get a status conference.
Sue Langhoff testified she had been Judge Green's secretary from September 1992 until June 1993. In connection with her duties as the Judge's secretary, she had spoken face-to-face with relator and recalled relator having come to the Judge's office on more than one occasion wanting to speak to the Judge. On these occasions, relator "seemed upset," based more or less on his tone of voice, which was "somewhat of a demanding tone." She never honored relator's requests and did not recall relator making the same request after she told him the Judge would not see litigants in a case without their lawyers being present.
Langhoff testified that after she left her employment with the Judge, relator phoned her home, spoke to her husband and left a message. She returned the call and had a conversation with relator. Relator wanted to know why she had left her employment with Judge Green. She told him she had left amicably and it was none of his business. To her, the tone of relator's voice was "a little zealous." The conversation caused her to become "extremely upset," because a man who did not know her had found out who she was, obtained her phone number, and called her. She was concerned that relator might continue to call her and that he would "draw some charges of some kind up against him [Judge Green], a lawsuit or whatever." She further testified: "I had an uneasy feeling. I can't pinpoint as to any harm." Although she testified that she did not know if her conversation with relator was tape recorded by him, the record reveals that it was.[4]
Langhoff contacted the Judge's office about the call but did not tell Kathleen Zelden or Rebecca Kennedy that she believed the Judge was in physical danger from relator. The essence of her communication with Zelden and Kennedy was that relator was looking for information to use against Judge Green in a complaint, lawsuit, or charges. Langhoff did not have any further contact with relator after the phone conversation. On cross-examination, Langhoff stated that she called the Judge's office about the phone conversation on the day the conversation occurred and that she did not dispute that the conversation had been on February 1, 1994.
Kathleen Zelden testified that she was not at work on February 20, 1995. On the following day, she answered a call from a caller who identified himself as relator. The caller requested a status conference with the Judge and said that his daughter had to go home early and that he could not get in touch with her. In a February 24, 1994, letter, she had advised relator that the Judge does not meet with individual parties without counsel present. To her knowledge, no pro se litigant is allowed to have a status conference with Judge Green. Relator called "a lot." She estimated that relator called sometimes two or three times a day, asking for a status conference but stated she would record only one of the calls on a phone call message slip. When asked on cross-examination if relator was rude to her, she answered "borderline" and that he was persistent. He never threatened her or indicated he intended to or was about to harm her in any way. Many times, relator called and made routine requests for records about his case that were time consuming and an aggravation. To her knowledge, relator's requests were only for records and status conferences. According to her, at some point, she did become concerned for Judge Green's safety and asked Major Duck for additional security in the Judge's courtroom.
Kyron Sharp testified that on February 22, 1995, she came in contact with relator, who wanted a copy of the Judge's calendar. She indicated to relator that he could have a copy of the Judge's docket that was posted as a public record but not the court calendar, which was not available to the public. Sharp could tell relator was unsatisfied with her explanation, because he slammed his records *282 on the counter. Relator then looked at the docket board and left.
Robert Tyler confirmed that he answered the February 20, 1995, phone call from a person who identified himself as Tim Young. The caller wanted to talk to the Judge about a problem with his child and seemed a "little upset." Tyler stated that he received another call in 1995 from someone identifying himself as Tim Young, who asked for information and statistics about the family court.
St. Tammany Parish Sheriff's Sgt. David M. Durocher testified he served as bailiff in Judge Green's courtroom in 1993 through 1995. During his assignment to the Judge's courtroom, he was the only bailiff assigned to the court. Durocher recalled having seen relator inside the Judge's courtroom on two occasions. On one occasion after the Judge made a ruling adverse to relator's interest, relator got into a conversation with the Judge, which escalated and got a "little loud." Durocher stated that he did not recall relator having made "any advances toward the Judge or anything." Before the situation got "out of hand," Durocher asked relator to leave. Relator complied. On the other occasion when Durocher saw relator in the courtroom, relator stayed in the courtroom for between ten and fifteen minutes before leaving. On that occasion, Durocher did not see relator staring at the Judge or looking menacingly at the Judge. However, Durocher indicated his attention was not focused on relator, since relator was not causing any problem.
Durocher did recall being instructed by his supervisor to begin staying closer to Judge Green, although he did not recall the date he received those instructions. The supervisor did not mention relator's name when he gave Durocher the instructions. However, Judge Green told Durocher he had to escort him "because of what had taken place with Mr. Young." Durocher complied with the instructions and escorted the Judge all the way through the court complex.
According to Durocher, Judge Green never told him that relator was in the courtroom and that he wanted him to sit next to relator. Durocher never sat next to relator, although he did sit within ten to fifteen feet of relator.
Durocher testified that he may have seen relator a couple of times with a briefcase walking into the building across the street. He stated that when he did see relator enter or exit one of the offices it appeared relator was there taking care of business. Durocher also observed relator working on fire extinguishers in the courthouse one day, but relator was not doing anything wrong.
One day when Durocher left the courthouse in his vehicle, he saw something flying off the windshield. He stopped, picked the object up, and saw it was an ace of spades. Durocher referred to the card as "a calling card," a "death card," and stated that he "figured somebody out there doesn't care for me too much." He did not know who had left the card on his vehicle. However, in Defense Exhibit D-4, a police report dated February 6, 1995, reference is made to a statement by Durocher that he suspected that the person who left the card was David Brown, the only person with whom he had had "bad dealings."
The testimony of Lt. Jack West and Sgt. Wayne Mayberry revealed that, while he and Mayberry were transporting relator to Covington, relator asked them why he was being arrested. When informed the arrest was for stalking, relator asked whom he was accused of stalking and was informed that it was Judge Green. Similarly, Mayberry corroborated testimony by West that relator admitted there had been an instance when relator encountered Judge Green across from the courthouse and stared at the Judge. Mayberry stated that relator did not say that he had assaulted or threatened Judge Green or that he had done anything inappropriate to Judge Green. West and Mayberry testified that relator did not admit to having been in a parked car near Judge Green's home. West testified that relator acknowledged having been in the Judge's courtroom but stated that anyone could sit in a courtroom. According to West, relator also stated that Judge Green was corrupt and unfair and that he had filed a complaint against Judge Green with the Judiciary Commission.
During his direct examination by the prosecutor, West also gave the following responses:

*283 Q. Did he [relator] ever acknowledge being in a car around Judge Green?
A. I believe he did.
Q. Tell me how that came about?
A. It was mainly, I think Sergeant Mayberry. I believe I was driving the car. And Sergeant Mayberry was asking, continuing the dialogue.
Q. What did the defendant say about the car business? What did he say?
A. I believe he made pretty much the same statement. This is almost a year, for exact dialogue.
Q. All right. Well, just give me the gist?
A. The general statement was, Yes, he had been in a car. But you know, it is a public street.
Q. He had been in a car what?
A. That he, he may have been around Judge Green, but that, you know, it was public access.
On cross-examination, West reiterated that (although it was not relator's exact words) relator had mentioned that he "might have been behind Judge Green a few times driving or something like that. But you know, it's a public highway." Thereafter, on redirect examination, West testified as follows:
Q. All right. Now, you confused me at one point in time, where you had indicated that the defendant indicated that he had been behind Judge Green in a car. Okay. And then, on cross-examination, you had indicated to Mr. Boren that he had said he had mentioned maybe a couple times he had been behind Judge Green in a car?
A. Correct.
Q. Was it one time, a couple of times, to the best of your recollection, what did this defendant say?
A. Best of my recollection, I have to go with several, you know. Which is more than two.
After Mayberry failed to give any testimony during his direct examination about relator having said anything about having possibly been in a car around Judge Green, defense counsel cross-examined Mayberry on that point. Mayberry responded that he was in the car with relator at all times during the trip to Covington and that relator did not say anything about being in a car around Judge Green. On redirect examination, Mayberry testified that there were times during the booking of relator in Covington when Mayberry was not present, times when West could have had a conversation with relator that Mayberry would not have overheard.
Mayberry testified that defendant told him that he was very upset with Judge Green's decision in reference to relator's minor child. Mayberry indicated he concluded relator was very upset based on relator's demeanor and the tone of relator's voice. As relator spoke, relator was "very upset about it to the point where he was like gritting his teeth." Mayberry further testified that relator stated he had contacted someone with the television news show Sixty Minutes and that there would be a "big investigation" into Judge Green's conduct. Relator told Mayberry he would be seeing an airing on Sixty Minutes about relator's case with Judge Green and the Judge having harassed relator.
Mayberry testified that when he spoke to Judge Green, he observed that the Judge was "highly intimidated" by relator and was "fearful of harm" from relator, "[e]ven to the point of maybe even being killed by Mr. Young."
Mayberry determined from a check of computer records that a blue, four-door, 1978 Mercury Zephyr was registered to relator. Neither Judge Green nor anybody else told Mayberry that relator was driving a car that resembled the Zephyr. However, Judge Green had given Mayberry a description of the car the Judge had seen parked near the Judge's home; and the description was similar to the car the computer indicated was owned by relator.
Mary Grace Knapp testified that she had seen relator driving a light blue or powder blue small car, several years old, "like a little Maverick or something," although she did not think it was a Maverick. She "believe[d]" he was driving the same car until her withdrawal as relator's attorney in 1994 and that he "generally had the same vehicle." When asked if he ever drove a different *284 vehicle, she replied it was possible; but she had no recollection of any vehicle other than the one she described.
Maria Cordova, an employee and records custodian of the Louisiana State Police Safety Enforcement Division, gave testimony concerning records relating to the 1978 Zephyr. The records showed the vehicle had been registered in relator's name since September 22, 1993. A hand-written letter, purporting to be a sworn notarized statement, received by the Division on March 6, 1992, recited that relator had not operated the Zephyr since November 1993, that the car was in need of a motor and other work, and that relator would reinsure the car when it again becomes operable. An insurance affidavit executed by relator dated September 22, 1993, stated that the vehicle was unused or inoperable from November 1 through November 30, 1990, when it was disposed as junk for parts. However, Cordova testified that the Division does not verify the accuracy of the substance of such a sworn statement. Thus, Cordova could not say whether or not relator was still driving the Zephyr. Microfilm copies of the referenced documents were introduced into evidence as Defense Exhibit D-7.
Celestine Percy Poche testified that in October or November 1994, while he was still in the salvage business, he watched a 1978 Zephyr (bearing the same license number as the one registered in relator's name) get crushed by a machine and turned into junk. He stated that relator's father had called him to pick up the car and that after he picked it up he kept the car until it was crushed.
Elizabeth Jenkins, a minute clerk with the St. Tammany Parish Clerk of Court's Office, testified she had seen relator several times in the courthouse. On those occasions, she was working at the counter receiving filings. According to her, on those occasions, relator was doing what she thought was legitimate business. She knew relator was working on an appeal and on writ applications, and was asking for copies of documents from records. In response to defense counsel's question on cross-examination, if it was customary for people to "hang around" the courthouse while waiting for documents from the clerk of court's office, she answered in the affirmative.
Ron Rayburn, a friend of relator and next door neighbor, testified he operates Amcor, a business engaged in sales, service, and recharging of fire extinguishers and fire suppressant systems. In approximately September 1995, Rayburn hired relator as an independent contractor to work for Amcor. In that capacity, relator serviced fire extinguishers in the St. Tammany Parish courthouse in December 1995. On one occasion, Rayburn accompanied relator while relator serviced the extinguishers. After relator's arrest for stalking the Judge, relator was nervous about coming to the courthouse without having someone with him, fearing he might be arrested again. Both before and after relator's arrest, Rayburn and sometimes Rayburn's wife brought relator to the courthouse for relator to obtain papers and records for use by relator in working on writs or his appeals of the adverse rulings in relator's domestic case.
Margaret Cynthia McClain, who worked for Judge Green as a minute clerk since he took office as judge, testified she had seen relator in the courthouse and knows him. She has had nothing but pleasant and polite dealings with relator and never any problems with him. According to McClain, there were occasions when relator came over to the counter when he was checking on a record, or if he wanted to see what happened on a certain day regarding his case or find out if the Judge had rendered a decision. She never felt that anything relator did during those encounters was inappropriate in any way.
McClain also saw relator on one occasion in the courtroom, when relator's case was not on the docket. On that single occasion, relator sat in the rear of the courtroom and was "just observing." She saw relator in the courthouse a "quite a number of times" when relator's case was not on the docket and it seemed relator was acting as his own attorney reviewing or checking out records. McClain was aware relator was unhappy with the Judge's decision and that relator was appealing the matter. However, relator never *285 made any specific complaints to her about the Judge or court personnel.
McClain recalled having been told that if relator was in court for any reason other than his case being on the docket, to notify "everybody" of that fact. She also recalled an occurrence when relator talked to Kyron Sharp about the docket sheet, which she believed "cause[d] a stir." McClain stated that she did not know if it was actually the court calendar that relator requested rather than the docket sheet.
Raymond Jenkins, deputy clerk of court in St. Tammany Parish, testified he sometimes had seen relator in the civil records section of the clerk of court's office during the period from September 1993 until September 1995. Raymond Jenkins personally dealt with relator when relator requested records and stated there was nothing unusual about persons looking at public records which are open to public inspection. Raymond Jenkins identified Defense Exhibits D-10A and D-10B as civil suit account detail reports corresponding to the two domestic suits litigated by relator and Linda Warden in Judge Green's courtroom. Information in the reports revealed that on January 23, 1995, relator had filed exhibits into one of the records, that on the following day relator had obtained an order and some exhibits in that record, and that, thereafter, relator had incurred various charges and made deposits.
Willie Mae Galloway, a captain in the Civil Department of the St. Tammany Parish Sheriff's Office, testified she had known relator for a long time and had seen him "quite often" in the courthouse when relator worked for a finance company. She signed Defense Exhibit D-9, a document typed on stationary of the Sheriff's Office.[5]
Cheryl Kolbe, who worked in the same department as Galloway, testified she had known relator from the time relator had a finance company. She had seen relator around the courthouse picking up papers and doing business in the courthouse. Galloway gave her D-9 and told her relator would pick it up. Relator called to apologize for not picking up the letter. Kolbe stated she had had other dealings with relator when he came into the office to pick up papers. Relator was always nice.
Viewing the evidence, both direct and circumstantial, in the light most favorable to the prosecution, we are convinced that any rational trier of fact would have had reasonable doubt that relator was guilty of the crime of stalking.
In regard to the element of "following," the only evidence consisted of the testimony of Lt. West. On direct examination, West stated that he "believe[d]" that relator made the "general statement" (while he and Sgt. Mayberry were transporting relator in the car from Mandeville to Covington) that, while relator was in a car on a public street, relator "may have been around Judge Green." On cross-examination, West testified that relator mentioned that he "might have been behind Judge Green a few times driving or something like that." When West was further questioned on redirect examination as to how many times relator was driving behind Judge Green, he responded that "he would have to go with several, you know. Which is more than two." Although West testified that he was unsure of the exact statement made by relator, in his testimony West used the phrases "may have been around" and "might have been behind." However, as a reviewing court, we cannot ascribe any meaning to the testimony of a witness other than or beyond the fair import of the witness' words in the context in which the words were used. Thus, West's testimony, ambiguous and ambivalent, was equally probative of relator having been in a car around or behind the Judge as it was of relator not having been in a car around or behind the Judge. Furthermore, West's testimony concerning the statements allegedly made by relator that relator was in a car around or behind the Judge is in direct conflict with testimony given on cross-examination by Sgt. Mayberry (the case officer who prepared the police report and was also in the car at the time the statement was allegedly made). Mayberry testified on cross-examination *286 that he was inside the car with West and relator at all times during the trip from Mandeville to Covington, and Mayberry emphatically and unequivocally stated that relator did not admit during the trip that he had been following the Judge in a car and did not say anything about having been in a car around the Judge. Notwithstanding West's testimony indicating that the alleged statement was made by relator during the trip, on redirect examination of Mayberry, the prosecutor elicited testimony from Mayberry that after West, Mayberry, and relator arrived in Covington there were times during relator's booking when relator could have made statements outside Mayberry's presence. However, even assuming the alleged statement related through West's testimony was made at a time when Mayberry was not present to hear it, the testimony by West recounting the substance of the alleged statement, ambiguous and ambivalent, remains unchanged. Accordingly, there was a complete failure of proof of the element of "following."
We now turn to the element of "harassing." There can be little doubt that relator's conduct in phoning the Judge's office and writing letters to the Judge's office and his staring at the Judge on two or three occasions inside the courtroom and on one occasion outside the courthouse was annoying. However, militating against there being willful, malicious, and repeated harassing is that much of relator's conduct was constitutionally protected, e.g., relator had a right to be in the Judge's courtroom even on days when the domestic matter in which he was a litigant was not on the docket; and relator also had the right of access to public property, including inside and outside the courthouse and other public offices located in or near the courthouse such as the clerk of court's office, which were facilities completely open to the public. See La. R.S. 14:40.2(C)(1) & (2) (which effectively excludes constitutionally protected activity from the definition of harassing). Surely, it would have been reasonable to expect relator would be in and around the courthouse, including the clerk of court's office, and particularly to be in and around those places while pro se filing and working on pleadings, writ applications, and appeals of the domestic suits. Neither does it appear unreasonable or unexpected that a pro se litigant, presumably unfamiliar with the court scheduling, undertaking self-representation would ask for the court calendar and have some misgivings after being denied the calendar on the basis that it was not for public distribution. Although relator's phone calls and letters attempting to communicate with the Judge were inappropriate while he was represented by counsel, after he undertook self-representation it appears reasonable that he would have sought to have status conferences by contacting the Judge's office, just as Mary Grace Knapp indicated she would do as attorney, at least until relator was informed by the Judge or his staff that a formal written pleading was required to obtain a status conference. Additionally, any calls relator made while pro se requesting records or seeking to determine whether rulings had been made clearly were appropriate inquiries.
The Judge's testimony concerning the incidents on February 23, 1995 (the day preceding relator's arrest), i.e., relator staring disdainfully at him for 5-10 seconds outside the courthouse shortly after the Judge's return from home where he sighted a white male parked in a car near his home, adds very little to the overall evidence. Just as the Judge himself acknowledged during his testimony, such a stare might have been understandable as one from a litigant who had received an adverse ruling in a custody case. The Judge did not know the identity of the occupant of the parked vehicle, did not obtain the license number of the vehicle, and in his own words he had only a strong suspicion the occupant was relator. Thus, there was no evidence linking relator to the parked vehicle, notwithstanding any similarity between the Judge's general description of the parked vehicle and any vehicle relator may have owned or driven at the time in question. The phone call to Sue Langhoff on or about February 1, 1994, (considered in the context of the complaint relator made against the Judge to the Judiciary Commission that same month within days after the call) adds little, if anything, to the state's case, particularly considering Langhoff's testimony indicating she felt relator was seeking information *287 he could use against the Judge in a complaint, charges, or a lawsuit. Thus, it could reasonably be concluded that the call to Langhoff was to seek information to support a complaint such as the complaint relator made to the Judiciary Commission.
In any event, even assuming arguendo that there was sufficient evidence of willful, malicious, and repeated harassing, we are convinced that a rational trier of fact would have had a reasonable doubt that relator acted with the requisite element of specific intent, i.e., that relator had the intent to place the Judge in fear of death or bodily injury. Such a conclusion appears supportable by the following. There was no evidence that relator ever even spoke to the Judge, except in the Judge's courtroom in regard to the domestic cases, and no evidence that relator made or otherwise conveyed any threat or semblance of a threat, orally or in writing, or through his actions or conduct toward the Judge or anyone else that would evince the requisite specific intent to place the Judge in fear of death or bodily injury.
Consequently, because the evidence is constitutionally insufficient to support relator's stalking conviction, we recall our denial of this application, grant the application, reverse his conviction, vacate his sentence, and enter an order of acquittal. Cf. State v. Harris, 577 So.2d 220, 224 (La.App. 1st Cir. 1991).
DENIAL OF RELATOR'S WRIT APPLICATION RECALLED, WRIT GRANTED, CONVICTION REVERSED, SENTENCE VACATED, ORDER OF ACQUITTAL ENTERED.
SHORTESS, J., adds a statement.
SHORTESS, Judge, concurring.
I additionally make this observation. Most judges who have just read this opinion, will either empathize or sympathize with Judge Green, as do I. The heavy burden imposed upon us, as judges, coupled with the double-edged reality of its practical implications, many times leaves us feeling very defenseless.
NOTES
[1] We note that, notwithstanding relator's assertions in his assignment number one to the contrary, because he was charged with two misdemeanor offenses in a single bill of information, the maximum aggregate penalty for the charged offenses was imprisonment not to exceed six months and/or a fine of no more than one thousand dollars. Thus, the proper mode of trial for these charges was a bench trial rather than a jury trial. Consequently, there was no error by the trial court in not advising relator of the right to a jury trial or obtaining a waiver of the right to a jury trial, since relator had no right to a jury trial. See La.Code Crim.P. arts. 493.1 & 779; State v. Johnson, 458 So.2d 1301 (La.1984). See State v. Young, 97-0809 (La.11/21/97)(on rehearing), 703 So.2d 1253, in which the Supreme Court noted that its independent review of the trial record revealed the state restricted its proof in the instant case to acts which occurred before the effective date of the 1995 amendment (1995 La. Acts, No. 645, § 1), at a time when the crime of stalking was a six-month misdemeanor offense under La. R.S. 14:40.2(B)(1).
[2] See our unpublished opinion in relator's consolidated pro se appeals in Young v. Young, 94-1340 & 94-1341 (La.App. 1st Cir. 12/22/94), 648 So.2d 519, writ denied, 95-0575 (La.4/21/95) (La.6/16/95), 655 So.2d 342.
[3] Later, during his cross-examination concerning the murder/suicide, the Judge gave testimony concerning a threat to kill him made by a woman from Slidell, Louisiana.
[4] The tape and a transcript of the tape were admitted into evidence as Defense Exhibit D-8, with the court ordering the tape sealed.
[5] The document dated February 23, 1995, recites that, after checking with process servers regarding the possibility that a statement was made that Diane Fabacher had a history of avoiding service of process, Galloway was unable to find anyone who remembered making such a statement.