STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

11-246

STATE OF LOUISIANA

VERSUS

DAVID LYNN SAUCIER

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 297,729
HONORABLE THOMAS M. YEAGER, DISTRICT JUDGE PRESIDING

SYLVIA R. COOKS
JUDGE

Court composed of Judges Sylvia R. Cooks, Oswald A. Decuir and Jimmie C. Peters.

AFFIRMED.

James C. "Jam" Downs
District Attorney
Numa V. Metoyer, III
Assistant District Attorney
P.O. Drawer 1472
Alexandria, LA  71309
(318) 473-6650
Counsel for Appellee, State of Louisiana

Dmitre I. Burnes
P.O. Box 650
Alexandria, LA  71309-0650
(318) 448-0482
Counsel for David Lynn Saucier

COOKS, J.

## FACTS AND PROCEDURAL HISTORY

Defendant, David Saucier, was convicted of stalking his former wife, Candace Saucier, by following her on a motorcycle from the home of a friend to TCBY, a yogurt shop. He has a previous conviction for stalking her in April 2009. Defendant was charged by a bill of information with stalking, second offense, a violation of La.R.S. 14:40.2(A) and (B)(4). Defendant was tried before the bench on July 30, 2010, and was found guilty as charged. He was sentenced on August 13, 2010, to ten years imprisonment without the benefit of probation, parole, or suspension of sentence.

Defendant's "Motion to Reconsider Sentence Pursuant to C.Cr.P. art. 881.1" was filed on September 10, 2010. A hearing was held on February 14, 2011, following which the trial court denied the motion.

Defendant has perfected a timely appeal and alleges: (1)The evidence presented at trial was insufficient to sustain the verdict of guilty of a violation of LA. R.S. 14:40.2, stalking, second offense; (2) the trial court erred by "testify" [sic] and using facts not in evidence to reach the verdict of guilty; (3) the trial court erred in finding that defendant was the only one who would know Ms. Saucier and Ms. Laffitte and basing its guilty verdict thereon; (4) the trial court erred by making improper statements at the sentencing and on hearing on the *Motion to Reconsider Sentence*; and (the trial court erred by imposing an excessive sentence (and denying the Motion to Reconsider Sentence) and sentenced [sic] Defendant to serve ten years at hard labor.

After reviewing the record, we find there are no errors patent.

## ASSIGNMENT OF ERROR NUMBER 1:

In this assignment of error Defendant argues that the evidence was insufficient to support a conviction because the testimonies of the two State's witnesses "were riddled with contradictions and implausible statements." He also argues that the facts as presented at trial proved he was not the man who followed Ms. Saucier and her friend to the TCBY on the motorcycle.

At the beginning of trial, the State entered into evidence lower court case file, docket number 295,456, wherein Defendant was charged with one count of stalking and one count of criminal damage to property. He pled guilty on April 1, 2009, to two counts of stalking, one of the counts under docket number 295,456 and a prior charge, and to two counts of violation of protective orders. The State dismissed the charge of criminal damage to the victim's property and a third charge of stalking.

The State also entered into evidence lower court case file, docket number 200,630, which contained four orders of protection beginning in 2000, including an order of protection which was in affect at the time of the current incident, all directing defendant desist from certain contact with his ex-wife. Defendant did not object to the introduction of these court documents.

Candace Saucier testified that she and Defendant met in 1993. In 1996, she and Defendant had a son. They married in 2000 and divorced the following year. She testified that on the morning of May 5, 2009, she went to city court regarding an allegation of simple battery Defendant made against her. She stated the charge was dismissed. Shortly after noontime, she went to visit a friend, Jacquelyn LaFitte, at her apartment. When she and Ms. LaFitte left the apartment to go to the TCBY, she saw a neon yellow motorcycle drive

3

rapidly by and thought Defendant was the driver. She testified that while waiting at a stop light, she saw him again sitting on the bike in the Goodyear parking lot. This time she was certain it was Defendant. She further stated that Ms. LaFitte also recognized Defendant for certain this time. According to Ms. Saucier, when they pulled into the parking lot of TCBY, in the Emerald Square Shopping Center, Defendant continued down the street. As they were ordering their ice cream, Defendant drove by the TCBY several times. Eventually, he drove into the parking lot and "came right in front of the door areas where TCBY is and stopped and revved up the motorcycle then took off." Ms. Saucier described the shop and stated that the front of the shop was all glassed in and she had a clear view of the parking lot through the front window.

Ms. Saucier testified that she feared Defendant. She stated that she has feared him since "I put my first charge on David," in 1998.

Jacquelyn LaFitte's testimony regarding the incident was essentially the same as Ms. Saucier's, except that she said that she did not see him drive into the TCBY parking lot and up to the front door. She did, however, testify that he revved the bike every time he drove by and looked at them.

Rodney Wells (Wells) testified he has known Defendant for years and that Defendant often did mechanical work for him. He stated that he owned the neon yellow motorcycle at the time of the incident. According to Wells, Defendant sometimes rode the bike, he sometimes rode the bike, Mark Hennigan sometimes rode the bike, but his son, Justin, usually rode the bike. He further stated he did not recall if Defendant had the motorcycle on May 5, 2009. Mark Hennigan testified that he purchased the neon yellow motorcycle and

4

that Defendant had not ridden the bike since he owned it. He testified he did not recall when he purchased the bike nor did he recall whether he used the bike on May 5, 2009.

Christine Gaspard was the TCBY's employee working on May 5, 2009. She stated she remembered the day specifically because it was her birthday. She did not remember anything untoward happening in or in front of the shop that day.

Defendant testified and denied he was the rider of the neon yellow motorcycle on May 5, 2009. He stated, after being in city court that morning, he worked with Rodney Wells repairing a travel trailer the rest of the afternoon.

Defendant premises his sufficiency argument entirely on the contention that the two State's witnesses made up the "story." He argues that the "the two state's witnesses are irreconcilable on key facts. . . . of such monumental importance that it calls into question the truthfulness of the entire story." The contradictions Defendant asserts as "monumental" were whether Defendant drove past the TCBY on Jackson Street, or on the service road that "goes right beside TCBY"; whether Defendant was driving at a high rate of speed when they first saw him in front of Ms. LaFitte's apartment house as stated by Ms. Saucier or a slow rate of speed, as stated by Ms. Lafitte; and whether Defendant pulled the bike into the TCBY parking lot. Defendant also points out while Ms. LaFitte testified that she asked the shop's employee for a phone book to look up the police department's number, the clerk testified that no one asked her for a phone book that day.

Defendant further argues his defense witnesses' testimonies established the unlikeliness of the victim's and Ms. LaFitte's story. The record, however, reveals the three defense witnesses' testimonies did not refute Ms. Saucier's or Ms. LaFitte's contention that it was Defendant on the neon yellow motorcycle on the afternoon of May 5, 2009.

5

In *State v. Ryan*, 07-504, pp. 2-3 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268, 1270, while discussing sufficiency of the evidence, this court noted:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witness. Therefore, the appellate court should not second-guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See King*, 436 So.2d 559, citing *State v. Richardson*, 425 So.2d 1228 (La.1983).

> *State v. Lambert,* 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27. Thus, '[i]t is not the function of an appellate court to assess credibility or reweigh the evidence.' *State v. Smith*, 94-3116, p. 2 (La.10/16/95), 661 So.2d 442, 443.

In *State v. Milton*, 06-550, p. 7 (La.App. 3 Cir. 9/27/06), 939 So.2d 678, 682, *writs denied*, 07-643 (La. 12/7/07), 969 So.2d 625, *and* 07-1140 (La. 12/7/07), 969 So.2d 627, this court stated:

> The resolution of a matter where conflicting testimony exists requires a determination of credibility of the witnesses and is a matter of weight of the evidence and not sufficiency." *State v. Mitchell*, 01-0872, p. 9 (La.App. 3 Cir. 2/13/02), 815 So.2d 1041, 1047, *writ denied*, 02-0785 (La.11/8/02), 828 So.2d 1110, (quoting *State v. Taylor*, 96-1043, p. 5 (La.App. 3 Cir. 2/5/97), 688 So.2d 1262, 1267). While the witnesses' testimonies are not particularly specific, we find that they are not so inconsistent that the jury's determination was irrational, "especially in light of its function as a fact-finder and the deference given its credibility determinations[.] *Id.*

We find, upon reviewing the trial testimony, that the referenced "inconsistencies" in Ms. Saucier's and Ms. LaFitte's testimonies are not such that would have resulted in an irrational finding of guilt. Their testimonies were in agreement on the salient points; they

6

both saw Defendant outside Ms. LaFitte's apartment on a neon yellow motorcycle; they saw

him again in route to the TCBY; they saw him at the TCBY; and they saw him pass by the

front of the yogurt shop several times on the neon yellow motorcycle.

At the time of the offense, La.R.S. 14:40.2 provided, in pertinent part, as follows:

> A. Stalking is the willful, malicious, and repeated following or harassing of another person that would cause a reasonable person to feel alarmed or to suffer emotional distress. Stalking shall include but not be limited to the willful, malicious, and repeated uninvited presence of the perpetrator at another person's home, workplace, school, or any place which would cause a reasonable person to be alarmed, or to suffer emotional distress as a result of verbal or behaviorally implied threats of death, bodily injury, sexual assault, kidnaping, or any other statutory criminal act to himself or any member of his family or any person with whom he is acquainted.

> . . . .

> C. For the purposes of this Section, the following words shall have the following meanings:

> (1) "Harassing" means the repeated pattern of verbal communications or nonverbal behavior without invitation which includes but is not limited to making telephone calls, transmitting electronic mail, sending messages via a third party, or sending letters or pictures.

> (2) "Pattern of conduct" means a series of acts over a period of time, however short, evidencing an intent to inflict a continuity of emotional distress upon the person. Constitutionally protected activity is not included within the meaning of pattern of conduct.

In *Ryan*, 969 So.2d 1271-73, this court discussed the elements of stalking, as follows:

> In *State v. Higginbotham*, 00-1782 (La.App. 5 Cir. 5/16/01), 790 So.2d 648, *writs denied*, 01-1756 (La.5/3/02), 815 So.2d 95, the fifth circuit examined the sufficiency of the evidence introduced to support a stalking conviction. In his appeal, the defendant asserted that the evidence of his standing near the victim's home and passing her home in his truck did not establish "following" and that his activities did not constitute "harassing" because they were constitutionally protected. The fifth circuit agreed that there had been no evidence submitted to fulfill the "following" element of the stalking statute. *Id.* However, the fifth circuit concluded that the defendant's actions had been "harassing" as contemplated by the statute.

7

Higginbotham's victim had seen him near her home on several occasions. During two of the incidents, Higginbotham had menaced her. The defendant also called the victim's house several times a day at all hours. During two of the calls, the defendant had threatened to kill the victim, and one of the death threats included sexual violence. The fifth circuit held that the collective incidents clearly demonstrated that the defendant had willfully, maliciously, and repeatedly harassed the victim over a period of time with the intent to inflict a continuity of emotional distress upon the victim including the fear of death or bodily injury. Accordingly, the fifth circuit found sufficient evidence to support Higginbotham's stalking conviction.

In *State v. Rico*, 99-158 (La.App. 3 Cir. 6/2/99), 741 So.2d 774, *writ denied*, 99-1883 (La.12/10/99), 751 So.2d 244, this court found insufficient evidence to support the defendant's stalking conviction. This court concluded that the defendant's actions of "following" someone while that person drove to a series of three different locations constituted one "following" instead of the repeated "followings" required under the stalking statute. This court further found that the defendant had not verbally threatened the person he had been "following." Additionally, this court held that the defendant's actions did not constitute a physical threat. Rico did not verbally threaten the victim. Although he followed closely, he did not stop when the person he was following exited her car and went inside her house; he passed the person's home and turned around; the defendant did not use his vehicle to ram or hit the person's automobile; and, the defendant did not follow as the other car drove behind a building but waited for the vehicle to emerge from behind the building. This court determined that stalking is a specific intent crime and these actions did not evidence the requisite specific intent.

In *State v. Young*, 96-2079 (La.App. 1 Cir. 5/1/98), 712 So.2d 273, *writ denied*, 98-1598 (La.2/5/99), 737 So.2d 740, the first circuit reversed a defendant's stalking conviction. Young had been convicted of stalking a judge who had ruled against him in civil proceedings. The defendant, who was a *pro se* litigant, had made several calls to the judge's staff in the attempt to either speak to the judge or obtain a status conference. Young had been present at the courthouse or in the judge's courtroom on a number of occasions when the defendant's case was not docketed. During those times, Young reportedly stared disdainfully at the judge. The defendant had also called the judge's former secretary. The judge had seen a parked car with an unidentified occupant parked near his home. Finally, as the judge returned to work after seeing the car parked near his residence, he saw Young exit an alleyway near the courthouse and stare at him.

The *Young* court concluded that any rational trier of fact would have had reasonable doubt that the defendant was guilty of stalking. The first circuit found that the prosecution had failed to prove one of the elements of stalking: "following." The *Young* court also concluded that the prosecution

had failed to satisfy the element of stalking alternate to "following": "harassing." The first circuit conceded that the defendant's behavior had been annoying, but Young had a constitutionally protected right to be present in or around the courthouse even on days when his case was not on the docket because the building was open to the public. Moreover, the defendant's phone calls and letters seeking to speak with the judge had been inappropriate before he became a pro se litigant, but once Young began representing himself, that contact became reasonable for court business. Additionally, the defendant's call to the judge's former secretary could reasonably have been for the purpose of gathering information to add to the disciplinary complaint Young had been in the process of compiling against the judge.

The first circuit also determined that stalking is a specific intent crime and found that, even assuming that the State had successfully proven willful, malicious, and repeated "harassing," the trial court should have had reasonable doubt that Young acted with the requisite specific intent. Notably, the prosecution failed to demonstrate both that the defendant had ever spoken to the judge outside of the courtroom except in relation to his civil case and that Young had ever conveyed a threat or a semblance of a threat either orally, in writing, or physically. Thus, the State failed to prove that the defendant had the specific intent to place the judge in fear of death or bodily injury.

In *Ryan*, the defendant, who was convicted of one count of stalking, drove slowly by the house of a state trooper several times one day, staring hard at the house. On one pass, he saluted the trooper as the trooper stood outside watching him. The defendant and the trooper and his wife did not know each other, but the wife testified the defendant's behavior frightened her. The defendant admitted he drove by their house several times, stating that he was looking for another trooper whom he had read about in the newspaper and wanted to see what he looked like. While, the trial court found that "his driving up and down that road constitutes a pattern of conduct evidencing his intent to inflict a continuity of emotional distress," this court did not agree. *Id.* at 1271. After discussing the above cases, this court stated:

The difference between the reversals issued in *Rico* and *Young* and the affirmance in *Higginbotham* appears to be whether the State presented evidence that the defendant made any overt threat of death or bodily injury to the victim in order to prove the specific intent requisite to support a stalking

9

conviction. In this case, there is no evidence that Defendant followed the Wrights. Thus, in order to prove stalking, the State must have proven that Defendant harassed the Wrights, which means that the prosecution must have introduced evidence showing that Defendant committed a series of acts, i.e., verbal or nonverbal communications addressed to the Wrights, evidencing his specific intent to inflict a continuity of emotional distress upon them. La.R.S. 14:40.2.

Louisiana Revised Statutes 14:40.2 does not specifically define "following," and the *Higginbotham*, *Rico*, and *Young* courts all seemed to apply the standard interpretation of the term "following" to their cases: pursuit by traveling after. The *Higginbotham* court determined that driving past or standing near someone's abode did not constitute "following." *Higginbotham*, 790 So.2d at 650. The *Rico* court found a "following" when the accused closely pursued the victim. *Rico*, 741 So.2d at 777. The *Young* court concluded that parking near someone's home and frequenting areas where and at times the alleged victim would typically be present did not constitute "following." *Young*, 712 So.2d at 285. Therefore, as Defendant did not pursue the Wrights, the State failed to establish a "following" in this instance.

A stalking may occur when a perpetrator willfully, maliciously, repeatedly, and uninvitedly is present at someone's home and the perpetrator makes verbal or behaviorally implied threats that would cause a reasonable person to become alarmed or suffer emotional distress. *Id.* Because constitutionally protected activity is not included in the prohibited actions; because Defendant had the right to travel on the public roadway, use the parking area of the public walking park, and access the public areas of the apartment complex; and, because driving on the road and turning around in public parking areas do not constitute communication, those actions should not be considered a series of acts constituting harassment.

Since the State failed to prove that Defendant had the specific intent to commit stalking through submitting evidence showing that Defendant verbally or behaviorally communicated a threat to either of the Wrights, the prosecution failed to prove beyond a reasonable doubt that the Defendant was guilty of either stalking or attempted stalking. Therefore, the trial court, as a reasonable trier of fact, should not have found the essential elements of stalking proven beyond a reasonable doubt after viewing the evidence in the light most favorable to the prosecution. Accordingly, we reverse Defendant's conviction, vacate Defendant's sentence, and enter an order of acquittal.

*Id.* at 1273-74 (footnote omitted).

10

In the current case, unlike in *Ryan*, Defendant and Ms. Saucier knew each other and, according to testimony and other evidence, had a very acrimonious relationship. Also according to testimony, Ms. Saucier saw Defendant first outside Ms. LaFitte's apartment building, a second time in a parking lot while she was waiting at a stop light, and the third time at the TCBY, where she testified he drove by several times and once into the shop's parking lot. Ms. Saucier testified he stopped the bike by the shop's front door and revved the bike acting in a manner that frightened her.

In *State v. Plaisance*, 07-822 (La.App. 5 Cir. 3/11/08), 982 So.2d 179, the defendant was convicted of stalking after three encounters with the victim, which occurred months apart. In the first encounter, the victim and the defendant's own sister were jogging in a park when the defendant began yelling obscenities at them, telling them they were dead if they came back to the park. The second time he encountered the victim was in a courthouse where she was a court reporter and he was filing a disability claim. He told her he would "take care of her later." *Id.* at 181. The third time, the victim was visiting the defendant's sister when another friend asked for a ride to work. At the time, the victim noticed the defendant sitting in his truck across the street. After she dropped her friend off at work, the defendant pulled his vehicle behind her vehicle so that she could not back out and he began yelling something at her which she could not understand. On appeal, the defendant argued that the state failed to prove that he intentionally followed or harassed her.

The fifth circuit took issue with the defendant's claim, stating that:

> These three incidents clearly demonstrate that defendant harassed the victim by engaging in a series of acts over a period of time that evidenced an intent to inflict a continuity of emotional distress upon her. Additionally, the evidence showed that the victim had reason to be afraid of defendant, as he had previously been convicted of manslaughter.

11

Although defendant and his witnesses denied that any of the incidents occurred, the trial judge found the State's witnesses to be more credible. The credibility of a witness is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; therefore, the credibility of witnesses will not be reweighed on appeal. *State v. Rowan,* 97-21, p. 7 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.

Defendant argues that there is no evidence that he followed the victim. We find no merit in defendant's contention for two reasons. First, the evidence shows that defendant followed Gregory in 2004 when she drove to the Canal Bank Inn to drop someone off. Second, and more importantly, the stalking statute requires that the victim be either followed or harassed. (Emphasis added). La. R.S. 14:40.2A. Here, the evidence showed that defendant harassed the victim on three occasions and followed the victim at least once in an eighteen-month time period.

*Id.* at 184.

The fifth circuit further noted that "the record reflects that the defendant verbally and behaviorally communicated threats of bodily injury and death to the victim," and affirmed the conviction. *Id.*

The evidence submitted to the trial court showed that Ms. Saucier had reason to be afraid of Defendant, considering that there were four orders of protection issued against Defendant since 2000, and that Defendant pled guilty to two counts of stalking a month prior to the current incident and to violations of prior orders of protection. The State also dismissed one other count of stalking and a count of criminal damage to victim's property in exchange for the guilty plea. In *State v. Jacks,* 07-805 (La.App. 1 Cir. 11/2/07), 978 So.2d 922, *writ denied,* 08-345 (La. 9/19/08), 992 So.2d 951, the first circuit affirmed a conviction for stalking, second offense. While the issue argued in *Jacks* was whether the state was using conduct that was the subject of a previous conviction to satisfy the elements of the present charge—a double jeopardy violation, the first circuit discussed the "repeated following or harassing" element of the offense of stalking:

Defendant asserts that the State cannot use his prior conduct that was the subject of his 2003 guilty plea to support the "repeated" element of the present stalking charge because such would be a violation of the Double Jeopardy Clause. Defendant argues that there was no repeated act because the July 17, 2006 incident was a single incident and because his prior acts of stalking were the subject of his 2003 plea bargain, they cannot be considered relative to the current charge, under principles of double jeopardy.

In *State v. Rico*, 99-158, p. 5 (La.App. 3 Cir. 6/2/99), 741 So.2d 774, 777, *writ denied,* 99-1883 (La.12/10/99), 751 So.2d 244, the Third Circuit defined "repeated" as used in LSA-R.S. 14:40.2(A) as meaning "renewed or recurring[.]" The *Rico* court determined that, in that instance, defendant's actions were not sufficient to satisfy the elements of stalking. Rico was charged with a "repeated following" of the victim as opposed to a "repeated harassing" of the victim and in that case, Rico had no prior history with the victim. Rico had encountered the victim only that once and had followed her on only that day. The court determined that because "repeated", as defined by Webster's Dictionary, is "renewed or recurring again and again," and Rico had encountered the victim only once, the facts did not support a stalking offense. That is not the case here. Jacks has previously been convicted of stalking the Rogillio family and "renewed" that harassment on July 17, 2006.

. . . .

As stated by the Georgia Court cf. [sic] Appeals in *Daker v. State*, 248 Ga.App. 657, 660, 548 S.E.2d 354, 356 (Ga.App.2001), *cert. denied,* 535 U.S. 1085, 122 S.Ct. 1977, 152 L.Ed.2d 1035 (2002), "stalking is, by its very nature, a cumulative crime." The Louisiana Legislature's inclusion of specified types of "repeated" behavior to define the offense of stalking is consistent with the idea that stalking is a cumulative crime.

Clearly, the Legislature sought to criminalize certain behaviors because of the impact on a victim of not only causing fear or emotional distress directly arising from the complained of acts, but the idea that if unpunished, this behavior would be likely to escalate.

We conclude that the facts in this case do not present a double jeopardy issue. By definition, stalking cannot consist of a single incident. The behavior must, by definition, be recurring or renewed. However, once a pattern of behavior has been established, any subsequent act will be of a recurring or renewed nature; whether the prior acts were prosecuted or not is of no moment. It is only the subsequent act, if prosecuted, for which a defendant is placed in jeopardy.

The Fifth Amendment provides that "[no person shall be] subject for the same offence to be twice put in jeopardy of life or limb." Each

successive act of harassment creates a new offense for which a perpetrator could not possibly be in jeopardy until the new offense has been committed. One "new" act is enough; the statute does not require two or more new acts in order to prosecute a new offense. If the new offense is prosecuted, new facts and new evidence will necessarily be required in order to convict. Thus the prohibition against "double jeopardy" is not applicable.

*Id.* at 925-27.

In the current case, testimony established that on the morning of May 5, 2009, Ms. Saucier had been in city court regarding an allegation of simple battery Defendant made against her, which was dismissed. Accordingly, it appears that he then followed her from the courthouse to her friend's apartment. While there was no testimony that on May 5, 2009, Defendant made verbal threats or that he was "repeatedly following" her, we find the evidence submitted at trial showed Defendant "renewed' his harassment with the specific intent to inflict a continuity of emotional distress upon the victim. Accordingly, considering all of the prior stalking convictions and violated orders of protection, we find Defendant's behavior exhibited a pattern of harassment sufficient to satisfy the elements of the offense of stalking.

## ASSIGNMENT OF ERROR NUMBER 2:

Defendant argues that the trial court erred when it used facts not in evidence to reach the guilty verdict. He notes that while giving his reasons for the judgment, the trial judge stated " 'and because I have children I'm familiar with the place. For the record, it is in Emerald Square Shopping Center.' " The trial court then described the location of the TCBY and noted that the windows were tinted because of the bright sunlight.

In brief, Defendant states:

> It is important in this case because it goes to several contested questions presented. There was a question concerning whether the windows of the store were or were not tinted. There was a question of whether the

14

witnesses remembered if the store windows were tinted. There were questions concerning what was and was not visible out of the store windows.

We note that during Ms. Saucier's testimony, she described the location of the TCBY, stating that it was in the Emerald Square Shopping Center. She testified as to which streets the shop was adjacent to and described the windows in the shop. Ms. Saucier did not mention that the windows of the shop were tinted. Ms. LaFitte remarked, when asked, that she did not recall whether the shop's window was tinted. Ms. Gaspard, the shop's employee, testified that the windows were tinted, "but you can still see through them. They're tinted on the inside, so we don't get hit with direct sunlight." She described the windows in the shop and further testified that one could see the street clearly, particularly if there were not many cars in the parking lot.

Although the trial judge prefaced his statement with the fact that he had children and was familiar with the shop, he did not recite facts not placed into evidence. The location of the TCBY, the area, windows, parking lot, and whether the windows were tinted were all entered into evidence through testimony. We find no merit to this assignment of error.

### ASSIGNMENT OF ERROR NUMBER 3:

In this assignment Defendant further argues the trial court premised its verdict on "a leap of logic unsupported by evidence that the defendant was the only person who would know Ms. Saucier and Ms. Laffitte." During reasons given for judgment, the trial judge noted:

> The first question I had is, uh, obviously, there was someone that passed by the apartment of Ms. LaFitte that day on the motorcycle. There was somebody that was at the flower shop at the corner of, I believe it's Dorchester and Jackson Street at the flower shop. There was somebody that passed by TCBY three times on the same motorcycle, and there was somebody, there was obviously someone on a motorcycle that stopped and looked at them at TCBY. Who would be doing that? Who knows Ms. Saucier

15

and Ms. LaFitte? The only person that I can think of that would know those people would be Mr. Saucier.

Defendant argues in brief:

However, this is a conclusion or "fact" that was not supported by the evidence presented at trial. Nowhere during the testimony by Candace Saucier (See generally Record 112, at Page 145-Page 178) or in the testimony of Jacqueline Laffitte[sic] (see generally Record 112, at Page 179-Page 189) were there any questions directed to who both witnesses might know or who might know both witnesses. In a city the size of Alexandria and a state the size of Louisiana (or for that matter in the entire United States or world), there are probably many people who the two know in common and who know both of them. Confining our attentions strictly to Alexandria, there are likely dozens of people might know both witnesses.

At trial, Defendant argued it was not him on the bike on May 5, 2009. Two witnesses testified that Defendant seldom rode the neon yellow motorcycle. It was asserted that either Rodney Wells, his son Justin, or Mark Hennigan, was riding the bike that day. While Ms. Saucier was never asked if she knew these men, Ms. LaFitte was asked and she denied knowing any of them. We believe it is obvious Defendant's assertion that it was someone else on the neon motorcycle that day was what the trial court was referring to when he made the above statement. We find based on the testimony at trial it was reasonable for the trial judge to have concluded (in a somewhat inarticulate manner) that of the above three named men, only Defendant would have known where Ms. Lafitte lived, so as to find Ms. Saucier after he saw her at city court that morning.

We find this assignment of error has no relevance to the issue of Defendant's guilt or innocence of the offense of stalking, and is wholly without merit.

### ASSIGNMENTS OF ERROR NUMBER 4 AND 5:

For his final two assignments of error, Defendant asserts that the trial court made improper statements at the sentencing hearing and at the hearing on his "Motion to

Reconsider Sentence." He further argues the sentence of ten years imprisonment without the benefit of parole, probation, or suspension of sentence is constitutionally excessive under the circumstances of his case.

Defendant was convicted of stalking, second offense. Louisiana Revised Statutes 14:40.2(B)(4) provides that for a second conviction of stalking within seven years of a first conviction, the offender shall be imprisoned without the benefit of parole, probation, or suspension of sentence, for not less than five years and not more than twenty years, and may be fined not more than five thousand dollars, or both. Defendant was sentenced to ten years, one half of the possible sentence he could have received.

At the sentencing hearing, the trial court stated for the record:

> I have looked at the aggravating and mitigating factors under Article 894.1. I do not see any aggravating factors that are present. I do not see any mitigated factors that are present either. But, I'm going to find that during – that there is an undue risk during a period of suspended sentence or probation, that you will commit another crime, that you're not entitled to probation, because of this statute. I believe that you're in need of correctional treatment, a custodial environment that can be provided most effectively by your commitment to an institution; and I believe that the lessor [sic] sentence would deprecate the seriousness of the crime.

> I have a printout from the records of the 9th Judicial District Court. This is a printout that our Clerk's Office has of every time you've been arrested in Rapides Parish since 1983, and it shows 30 arrest since 1983, and it has a list of –

> . . . .

> There has been so many arrest, it's been kind of hard for me to go through these arrest. And, some of these are APD's, which means they were handled in City Court. But, your first conviction was in 1992, for Simple Kidnaping; at that time, you were charged with 2 counts of Forcible Rape, One Count of Aggravated Sexual Battery, One Court, of Aggravated Kidnaping, and Simple Kidnaping, and Simple Kidnaping. You plead guilty to that, and you got five years probation, and you were revoked on your probation in July of '93, and had to serve 42 months with the Department of Corrections.

17

Since the—I'm just not going to read all—well, I guess I ought to. You've been arrested for Simple Burglary, Possession of Stolen Goods, Simple Burglary, Criminal Damage, Forcible Rape, Aggravated Kidnaping, Disturbing the Peace Fighting, Criminal Damage, Criminal Mischief, Criminal Mischief, Stalking, Criminal Mischief, Aggravated Burglary, Simple Assault, Criminal Damage, Malicious Damage, there was a Simple Battery, Malicious Damage, Malicious Damage, Telephone Harassment, Sixty days in Alexandria City Court for a Simple Battery, Entry into an inhabited dwelling, Aggravated Assault, Simple Battery, Criminal Damage, Simple Assault, Simple Battery. Then, you were convicted of a violation of a protective order in April 1st of '09, when you plead guilty to that one, they dismissed another one, they dismissed a Stalking charge against you. Then, you also plead guilty on that date for Stalking, and they dismissed the Criminal Damage, and the Violation of a Protection Order against you. You also plead guilty to another stalking on that date. So, you plead guilty to two Stalking that date and all the other charges were dismissed against you. That was April 1st of '09.

May 4th of '09, you were charged with Violation of a Protective Order again, one month later. And, then, seven days later—eight days later, you were charged with this offense, Stalking, 2nd Offense, in Violation of a Protective Order.

I have gone back and pulled some files of yours; Booking Number 7, Simple Kidnaping, in that case, there was a lady by the name of Natalie Branton (phonetic), that was your wife, I believe. She wouldn't do whatever you told her to do, so you went over to her place of employment, grabbed her by the hair, dragged her out of the place of employment, and took her out into the country and raped her on two different occasions. Her brother is a State Police Officer, I don't know why in the world he didn't shoot you for doing that.

In brief, Defendant objects to the above statement regarding the brother who did not shoot him, stating that the matter did not concern the current victim and should not have been considered. He also objects in brief to the fact the trial court took into consideration during sentencing a tape recording the trial court reviewed which pertained to a 2008 stalking charge.

And, the most important thing that we have in any of this, I have been surprised about, sir, — Mr. Saucier, I very rarely get surprised with what I see. I've done this fourteen years, and you have surprised me. This statement that you made without knowing, November 18, 2008 is in the file, with Booking

18

Number 27, the Stalking charge. Ms. Saucier had a tape recorder in her purse and tape recorded a conversation with you at 10 a.m., at a Subway. And, I want to tell you, sir, that I was absolutely floored by what I read about what you said. I'm going to give it to the Turning Point here to help train people to learn about how people like you think, and I'm going to send it to Baton Rouge also, because I think it's a very instructive, and a great educational tool for people to understand how you think. I've had domestic violence training, and domestic violence training–but I tell you what, you've taught me a lot about how people like you think in that one statement, so– Basically, what we have is someone who uses power to control people, and you have your rules, and we have our rules, and your rules are more important, sir.

Defendant argues the current sentence of ten years is excessive "inasmuch as the trial court based its original sentence upon that tape because it may or may not have been clear to the trial court at the time of the initial sentencing that the tape was of a conversation connected with a conviction for which the defendant had previously been punished[.]"

In *State v. Brandenburg*, 06-1158, p. 28 (La.App. 3 Cir. 2/7/07), 949 So.2d 625, 644, *writs denied*, 07-538 (La. 10/26/07), 966 So.2d 571, and 07-614 (La. 10/26/07), 966 So.2d 573, this court noted:

> The trial court has wide discretion in imposing a sentence, and a sentence imposed within the statutory limits will not be deemed constitutionally excessive absent a manifest abuse of discretion. *State v. Evans*, 97-504 (La.App. 3 Cir. 10/29/97); 702 So.2d 1148, *writ denied*, 97-2979 (La.4/3/98); 717 So.2d 231. This court, in *State v. Dubroc*, 99-730, p. 22 (La.App. 3 Cir. 12/15/99); 755 So.2d 297, 311, noted:
>
> > The relevant question on review of a sentence is whether the trial court abused its broad sentencing discretion and not whether the sentence imposed may appear harsh or whether another sentence might be more appropriate. *State v. Cook,* 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied,* 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). To constitute an excessive sentence, this court must find the penalty imposed is so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable

> contribution to acceptable penal goals; and, therefore, it is nothing more than needless imposition of pain and suffering. *State v. Campbell,* 404 So.2d 1205 (La.1981). The trial court is given wide discretion in imposing a sentence, and a sentence imposed within statutory limits will not be deemed excessive in the absence of manifest abuse of discretion. *State v. Pyke*, 95-919 (La.App. 3 Cir. 3/6/96); 670 So.2d 713.

*State v. Boudreaux*, 00-1467, p. 12 (La.App. 3 Cir. 4/4/01), 782 So.2d 1194, 1201, *writ denied,* 01-1369 (La. 3/28/02), 812 So.2d 645 (quoting *State v. Dubroc*, 99-730, p. 22 (La.App. 3 Cir. 12/15/99), 755 So.2d 297, 311.

Furthermore:

> In selecting a proper sentence, a trial judge is not limited to considering only a defendant's prior convictions but may properly review all prior criminal activity. *State v. Russell,* 40,526 (La.App. 2d Cir.1/27/05), 920 So.2d 866, *writ denied,* 2006-0478 (La.9/29/06), 937 So.2d 851; *State v. Jackson*, 612 So.2d 993 (La.App. 2d Cir.1993). Moreover, a trial judge may properly consider a defendant's attitude and criminal propensities when determining the appropriate sentence. *State v. Jackson, supra.* The sources of information relied upon by the sentencing court may include evidence usually excluded from the courtroom at the trial of guilt or innocence, e.g., hearsay and arrests, as well as conviction records. *State v. Myles,* 94-0217 (La.6/3/94), 638 So.2d 218. These matters may be considered even in the absence of actual proof the defendant committed the other offenses. *State v. Jones*, 31,569 (La.App. 2d Cir.12/9/98), 724 So.2d 810; *State v. Anderson*, 30,060 (La.App. 2d Cir.10/29/97), 702 So.2d 40.

*State v. Newton,* 43,079, pp. 3-4 (La.App. 2 Cir. 3/19/08), 978 So.2d 1196, 1199.

Finally, when an appellate court reviews a sentence for excessiveness, the court may consider several factors, including:

> [T]he nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position

20

to assess the aggravating and mitigating circumstances presented by each case."

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061 (citations omitted).

In the current case, we cannot say that the trial court abused its discretion when it sentenced Defendant to ten years imprisonment for a second conviction of stalking. It appears from the record that Defendant has subjected the victim to years of abuse and threats of violence. In *Jacks,* 978 So.2d 922, where the defendant was convicted of stalking, second offense, he was sentenced to the maximum prison term. While in *Jacks*, the prison terms at the time of the offense were from six months to three years, the following year, in 2007, the penalty for a second offense stalking was amended to provide for a minimum of five years and a maximum of twenty years imprisonment. 2007 La. Acts, No. 62, § 1. Obviously, the Louisiana Legislators believed the offense was serious enough to increase the penalty significantly for stalking, second offense. Furthermore, considering Defendant's lengthy arrest and conviction record of violent crimes against persons, we find the trial court did not abuse its considerable discretion when it sentenced Defendant.

There is no merit to these assignments of error.

For the reasons as stated above the Defendant's conviction and sentence are affirmed.

**AFFIRMED.**